**In re FLORENCE TANNERS, INC.,
Sami and Sana Yousif, Debtors.**

Bankruptcy Nos. 94–52306–R, 94–52307–R.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

June 3, 1997.

John Hertzberg, Southfield, MI, for debtors.

Todd Halbert, Southfield, MI, Louis P. Rochkind, Detroit, MI, for Halbert.

## *OPINION*

STEVEN W. RHODES, Chief Judge.

### I. *Introduction*

These two cases are before the Court on cross-motions for summary judgment on the fee applications of the debtors' attorney, Todd Halbert. His application in the *Florence Tanners* case seeks fees of $133,624 for 682.60 hours at $165 per hour plus 110.50 hours at $190 per hour. The application in the *Tanners* case also seeks expenses of $5,109.68. The application in the *Yousif* case seeks fees of $24,902 for 119.60 hours at $165 per hour plus 27.2 hours at $190 per hour. The application in the *Yousif* case also seeks expenses of $1,340.32. Thus, the total that Halbert seeks in his fee applications for these two cases is $164,976. The fee applications are captioned final fee applications and cover the time period from December 5, 1994 through November 27, 1996, the date the applications were filed.[1] The two cases were filed on December 9, 1994 and the debtors' plans were confirmed on September 18, 1995. Tanners operates several retail leather and fur coat stores in large shopping centers. Sami Yousif is the sole shareholder and president of Tanners.

Tanners and Yousif have objected to the fee applications on a number of grounds. The Court concludes that Halbert's fee appli-

cations in these two cases should be jointly considered and resolved, as were most matters in the two cases, including confirmation of the joint plan.

The Court concludes that the issues to be resolved in connection with Halbert's fee applications are as follows:

1. Did Halbert comply with the disclosure requirements of 11 U.S.C. § 329 and Rule 2016(b)?

2. Did Halbert comply with the disclosure requirements of Rule 2014(a) in connection with the debtors' motions for approval of his employment?

3. Did Halbert improperly take fees without court approval as required by 11 U.S.C. § 330?

4. What, if any, sanction should be imposed in the circumstances of these cases?

The Court concludes that Halbert did not comply with the applicable disclosure requirements and that he improperly took fees without court approval. However, in the interest of justice, the Court concludes that it would be appropriate to give the parties a further opportunity to be heard before a final determination on Halbert's fee applications.

### II. *Did Halbert Comply With the Disclosure Requirements of 11 U.S.C. § 329 and Rule 2016(b)?*

#### A. *The Applicable Law*

11 U.S.C. § 329(a) provides:

> Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

Rule 2016(b) provides:

---

1. In addition, Halbert also sent an invoice to the debtors for $57,579.42 for post-confirmation work covering the time period from September 19, 1995 through December 5, 1996. Thus, the total of fees and expenses that Halbert seeks for these two cases is $222,555.42.

442

**(b) DISCLOSURE OF COMPENSATION PAID OR PROMISED TO ATTORNEY FOR DEBTOR.** Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 15 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed.

These provisions require an attorney to disclose all fee payments and agreements made after one year before the bankruptcy filing, for services in contemplation of, or in connection with, the bankruptcy filings. Such disclosures must be made within 15 days of the filing, or within 15 days of a payment or agreement not previously disclosed. *See In re Downs*, 103 F.3d 472, 477 (6th Cir.1996). Each payment and each agreement must be separately disclosed.

The Court will review Halbert's disclosures and then discuss whether he properly and distinctly disclosed each fee agreement and fee payment.

### B. *Halbert's Disclosures*

On December 15, 1994, Halbert filed in each case a "Statement of Attorney for Petitioner Pursuant to Bankruptcy Rule 2016(b) ." In the Court's experience, the form that Halbert used is widely used, although it

is not an "official form."[2] In the *Tanners* case, Halbert disclosed:

(2) The compensation paid or agreed to be paid by the debtor(s) in this case.

    (a) for legal services rendered or to be rendered in contemplation of and in connection with this case ... $25,000.00

    (b) prior to filing this statement, debtor(s) have paid ... $26,600.00

    (c) the unpaid balance due and payable is ... $-0-

In the *Yousif* case, Halbert disclosed:

(2) The compensation paid or agreed to be paid by the debtor(s) in this case.

    (a) for legal services rendered or to be rendered in contemplation of and in connection with this case ... $time & charges

    (b) prior to filing this statement, debtor(s) have paid ... $-0-

    (c) the unpaid balance due and payable is ... $n/a

These are the only fee agreements and payments that Halbert disclosed in these cases.

### C. *Discussion*

Based on Halbert's fee application, as well as his affidavit in support of his motion for summary judgment, the Court must conclude that Halbert did not disclose all of the fee payments and fee agreements that he was required to disclose, and that therefore his disclosures are false, misleading and incomplete in several respects:

■ 1. His statement in the *Tanners* case gives the impression that by agreement Halbert's fee in that case is a flat fee of $25,000. That is false. The record establishes that there was no agreement between Halbert and Tanners for any flat fee, let alone a flat fee of $25,000. Rather, it is clear that the fee agreement was for an hourly fee.

**2.** There is no official form for the disclosures required by Rule 2016(b) that is required to be used under Rule 9009.

  The Court's local rules caution against the use of form pleadings:

    **(c) Use of Forms.** The use of a form pleading which contains extraneous factual allegations or legal arguments not applicable to the

matter before the Court may subject the individual who submits it to sanctions under Rule 9011 of the Bankruptcy Rules. Factual allegations in pleadings must be made with the proper respect for the applicable rules regarding relevance, specificity, and accuracy.

Rule 2.03(c), Local Rules of the Bankruptcy Court (E.D.Mich.)(1990).

Halbert disclosed no such hourly fee agreement and thereby violated Rule 2016(b).[3]

Halbert's statement in *Yousif* is also incomplete in that it does not give the particulars of the hourly rates agreed upon.

■ 2. Halbert's statement in *Tanners* gives the further impression that he had been paid a fee of $26,600. However, the parties had agreed that this money would be a retainer, to be placed in Halbert's client trust account. It was not a fee payment to him. As a matter of law, the retainer remained the debtor's property and became property of the estate when the petition was filed. *Downs,* 103 F.3d at 478; *In re Doors & More, Inc.,* 127 B.R. 1001 (Bankr. E.D.Mich.1991). Thus, Halbert's disclosure of $26,600 as a payment rather than a retainer violated Rule 2016(b).[4]

■ 3. Halbert's statement in *Tanners* gives the impression that the agreement for a fee of $25,000 was the *only* agreement between Halbert and Tanners regarding fees for services in contemplation of bankruptcy within the one year before bankruptcy. However, Halbert's affidavit and exhibits clearly establish otherwise. On December 5, 1994, Halbert submitted an invoice for $11,-997.50 for services performed from January 27, 1994 through December 3, 1994. (Exhibit C attached to Halbert's affidavit in support of his motion for summary judgment). This invoice reflects discussions of a chapter 11 filing beginning on April 21, 1994 and continuing periodically until the actual filings. That these discussions were in contemplation of bankruptcy is demonstrated in detail in paragraphs 8–10 and 12 of Halbert's affidavit. Clearly, there was an agreement that Tanners would pay for those services, but Halbert did not disclose such an agreement. It is true that when the debtors in the two cases sought approval of Halbert's employment, Halbert agreed to waive his claims for pre-petition fees. However, that waiver did not excuse Halbert's obligation to disclose the prior *agreement* for the debtors to pay an hourly fee for Halbert's services in contemplation of bankruptcy.

■ 4. Halbert's statement also gives the impression that $26,600 was the only money that he received within one year before the filing for legal services in contemplation of bankruptcy. Again, his papers clearly establish otherwise. During 1994, in payment for his legal services, Halbert received merchandise (coats) from Tanners pursuant to an agreement under which Tanners would be credited on Halbert's invoices at 40% of retail sales price, as follows (per exhibit 3 attached to Halbert's motion for summary judgment):

| Date | Retail Sales Price | 40% Credit Agreed | Balance Due to Halbert |
|---|---|---|---|
| 12/28/93 | | | $5,311.00 |
| ? | $10,120 | $4,140 | 1,163.00 |
| 9/17/94 | 250 | 100 | 1,063.00 |
| ? | 400 | 160 | 903.00 |
| 10/1/94 | 1,000 | 400 | 503.00 |
| 11/19/94 | 5,895 | 2,358 | (1,855.00) |

As noted, on December 5, 1994, Halbert submitted an invoice to Tanners for $11,-

---

**3.** The Court notes that in both cases, the Debtor's Application for Authority to Appoint Counsel, paragraph 8, states: "The fees of Mr. Halbert at present are $165 per hour and $55 per hour for paraprofessionals. Such fees are subject to change. All fees for legal services are subject to Court approval." These are the debtor's disclosures, as required by Rule 2014(a). They are, however, no substitute for the disclosures required by the debtor's attorney under Rule 2016(b).

**4.** In response to question 9 regarding payments relating to debt counseling or bankruptcy, Tanners disclosed:

Todd M. Halbert       12/07/94         $26,600 retainer
24359 Northwestern Hwy Suite 250 Southfield, MI 48075

John C. Bohl       12/07/94         $10,000.00 Retainer
24359 Northwestern Hwy. Suite 250, Southfield, MI 48075

Again, this disclosure by Tanners does not excuse, or comply with, Halbert's disclosure obligation under Rule 2016(b).

997.50, which included fees for services in contemplation of bankruptcy beginning in April of 1994. The table above establishes that on December 5, 1994, when that invoice was rendered, Tanners already had a credit of $1,855, which, Halbert has agreed, partially reduced that invoice. Thus, it is clear that at least part of the payment (by transfer of merchandise) on November 19, 1994 was a payment for legal services in contemplation of bankruptcy within one year of the petition. Indeed, it is highly likely that the transfers on September 17 and October 1, 1994 were also in payment, albeit partial payment, of legal services in contemplation of bankruptcy.

In any event, Halbert did not disclose any of the payments that he received for services in contemplation of bankruptcy within one year before filing, as required.[5]

5. Halbert's papers also reflect that he received ten payments for fees after the petition was filed, as to which Halbert was required to file supplemental disclosure statements under Rule 2016(b), but did not. These payments were of three types. First, Halbert took money from the retainer as follows (Exhibit 10, attached to Halbert's motion for summary judgment):

| | |
|---|---|
| 1/4/95 | $10,000 |
| 1/21/95 | 5,000 |
| 1/28/95 | 5,000 |
| 3/25/95 | 6,600 |

Next, Tanners paid the following amounts directly to Halbert (Halbert's affidavit, paragraphs 48, 51, 52, 54):

| | |
|---|---|
| 10/9/95 | $20,000 |
| 11/22/95 | 15,000 |
| 1/6/96 | 5,000 |
| 2/21/96 | 5,000 |

Finally, Halbert took the settlement proceeds of two preference adversary proceedings totalling $6,868.92 in payment of fees for legal services. (Exhibit 5, behind tab 6, attached to Halbert's motion for summary judgment, captioned "Legal Invoice").

Halbert offers no explanation for his failure to disclose the four payments he took from the retainer.

5. The debtors' applications to employ Halbert in both cases disclosed:

Mr. Halbert acted as counsel for the Debtor previous to the filing of its Chapter 11 petition on a variety of legal matters and received compensation therefor. Mr. Halbert has an unpaid claim against the Debtor for such prepetition services in the approximate amount of $12,-

He does argue that the latter two categories of payments to him (from Tanners directly and from the preference recoveries) were for post-confirmation legal services, and that under Article 11.2 of the confirmed plan, his fees were not subject to the prior review and approval by the Court. Certainly this provision of the confirmed plan excused him from the usual requirement to file a fee application under Rule 2016(a) and the requirement to obtain an order approving fees under 11 U.S.C. § 330(a). However, nothing in the plan excused Halbert from his obligation to file a supplemental disclosure of such payments within 15 days under Rule 2016(b). This rule applies post-confirmation. *In re John G. Berg Assoc., Inc.*, 138 B.R. 782, 787 (Bankr.E.D.Pa.1992).

In conclusion, the Court finds that Halbert systematically violated the disclosure obligations of 11 U.S.C. § 329(a) and Rule 2016(b) by: (1) filing a statement in *Tanners* that gives the false impression that the parties had agreed to a flat fee of $25,000 in that case; (2) failing to disclose the details of the hourly fee agreement in each case; (3) filing a statement in *Tanners* that gives the false impression that Tanners had paid him a fee of $26,600, without disclosing that it was actually a retainer; (4) failing to disclose Tanners' agreement to pay for services in contemplation of bankruptcy within one year before filing; (5) failing to disclose Tanners' pre-petition payments for fees in contemplation of bankruptcy; and (6) failing to disclose Tanners' ten post-petition payments for legal services in the bankruptcy case.

III. *Did Halbert Comply With the Disclosure Requirements of Rule 2014(a) in Connection with the Debtors' Motions for Approval of His Employment?*

A. *The Applicable Law*

Rule 2014(a) provides in pertinent part:

000.00 but he has agreed to waive such claim so that he may represent the Debtor as its counsel in this Chapter 11 case.

However, this disclosure does not comply with Rule 2016(b) for two reasons. First, it did not disclose the amounts of payments received for legal services in contemplation of bankruptcy. Second, and more importantly, this was not Halbert's disclosure, as required by Rule 2016(b).

The application [for approval of employment of a professional] shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

■ The purpose of this rule is to permit the Court to make an independent determination of any issue concerning whether the professional is disinterested. *See In re Martin,* 817 F.2d 175, 182 (1st Cir.1987); *In re Gray,* 64 B.R. 505 (Bankr.E.D.Mich.1986); *In re Micro–Time Management Systems, Inc.,* 102 B.R. 602, 606 (Bankr.E.D.Mich. 1989); *In re Brennan,* 187 B.R. 135 (Bankr. D.N.J.1995). As a result, professionals are well advised to err on the side of disclosure because the consequences of failing to make a full disclosure of all facts and circumstances bearing upon the "disinterested" issue can be denial of all or part of the professional's fees. *Brennan,* 187 B.R. at 154. Ultimately, the concern is for the integrity of the bankruptcy process. *Brennan,* 187 B.R. at 150.

11 U.S.C. § 327(a) provides:

Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 101(14) provides in pertinent part:

"disinterested person" means person that-
(A) is not a creditor, an equity security holder, or an insider;

. . . .

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason.

■ An adverse interest arises when two entities have a mutually exclusive economic interest. *Micro–Time Management,* 102 B.R. at 605 n. 4; *In re Granite Sheet Metal Works, Inc.,* 159 B.R. 840, 845 (Bankr.S.D.Ill. 1993); *In re Black Hills Greyhound Racing Ass'n,* 154 B.R. 285, 292 (Bankr.D.S.D.1993).

### B. *Halbert's Disclosures*

In his affidavit in support of Tanners' motion to approve his employment, Halbert disclosed:

TODD M. HALBERT, being first duly sworn, deposes and says that he is authorized to make this Affidavit, that he has a prepetition claim against the Debtor in the approximate amount of $12,000.00 which he agrees shall be deemed to be waived upon his appointment as Debtor's counsel in this case, that he neither holds nor represents any interest adverse to the Debtor's estate, that, except as set forth in the Debtor's Application for Authority To Appoint Counsel, he has no connection with the Debtor, creditors, any other parties in interest, their respective attorneys and accountants, the United States trustee or any person employed in the office of the United States trustee, and that he is a "disinterested person" as such term is defined in Section 101(14) of the Bankruptcy Code, and, therefore, Todd M. Halbert knows of no reason why he should not be appointed as counsel for the Debtor.

In his affidavit in support of the Yousifs' motion to approve his employment, Halbert disclosed:

TODD HALBERT, being first duly sworn, deposes and says that he is authorized to make this Affidavit, that he neither holds nor represents any interest adverse to the Debtors' estate, that, except as set forth in the Debtors' Application for Authority To Appoint Counsel, he has no connection with the Debtor, creditors, any other parties in interest, their respective attorneys and accountants, the United States trustee or any person employed in the office of the United States trustee, and

that he is a "disinterested person" as such term is defined in Section 101(14) of the Bankruptcy Code, and, therefore, Todd M. Halbert knows of no reason why he should not be appointed as counsel for the Debtors.

## C. *Discussion*

■ There is no issue with Halbert's status as a disinterested person due to his status as a pre-petition creditor; upon his waiver of that claim, he was no longer disqualified as a prepetition creditor. *Brennan*, 187 B.R. at 152; *In re Watervliet Paper Co., Inc.*, 111 B.R. 131 (W.D.Mich.1989). No one contends otherwise.

Likewise, there is no issue with Halbert's status as a disinterested person due to his representation of both the corporation and its principals, despite the principals' claims against the corporation. Halbert made a full disclosure regarding that matter and no issue concerning that was raised at the time of the

employment or in connection with his fee applications.[6]

The problem arises due to Halbert's failure to disclose the pre-petition payments (merchandise transfers) to him,[7] because they were potentially preferences.[8] As a result, Halbert might have an "interest materially adverse to the interests of the estate" under 11 U.S.C. § 101(14)(E), and was therefore required to disclose all such payments in his affidavit of disinterestedness.[9]

During the 90 days before the bankruptcy filing, Halbert received coats with retail sales prices totalling $17,665, for which Tanners received a credit of $7,066. Halbert now argues that these transfers were not preferences for the following reasons:

1. Because he received the coats before he sent the invoice, and because there was no obligation to pay until the invoice was sent, the transfers were not "on account of an antecedent debt owed by the debtor," under 11 U.S.C. § 547(b)(2). *Brennan*, 187 B.R. at 153.

6. In April or May of 1995, a creditor, Hamame, suggested to Halbert that his dual representation of Tanners and the Yousifs was improper. (Halbert's affidavit, paragraph 36). Halbert concluded that this was for tactical advantage, but it caused him to review his previous affidavits of disinterestedness. Following that review, Halbert wrote a letter to the United States Trustee disclosing that the Yousifs, as landlord, and Tanners, as the tenant, were parties to a lease. This was not previously disclosed in Halbert's affidavit of disinterestedness, although the lease was disclosed in the schedules in the two cases. No one presently raises any issue regarding these circumstances.

7. Tanners' statement of financial affairs disclosed the following in response to question 3 concerning payments made within 90 days of filing bankruptcy, "Numerous payments of ordinary trade and business debt. Documents are too voluminous to attach hereto." The Yousifs' statement of financial affairs is similarly conclusory, "Miscellaneous payments in the ordinary course of financial affairs."

The affidavits of Halbert (paragraph 31) and Bohl (paragraph 13) establish that although Halbert did not have primary responsibility for preparing the statement of financial affairs, he did review it and make some comments. He did not, however, advise his clients to disclose the transfers of merchandise to him within 90 days, as was required of them.

Halbert asserts in his affidavit that the debtors' answers regarding payments within 90 days of

bankruptcy is similar to the answers he advised his clients to give in several other chapter 11 cases that he identifies. The answer is nevertheless highly objectionable because it does not respond to the question. Simply stated, all payments within 90 days of bankruptcy must be listed.

Finally on this point, the Court must again note that even if the debtors had properly answered this question and disclosed the payments to Halbert, he was also required to disclose the payments under Rule 2014(a).

8. The transfers are also potentially voidable as fraudulent conveyances, as Halbert gave Tanners only a 40% credit on his invoice. 11 U.S.C. § 548(a)(2). However, because the debtors have not raised this issue, the Court will not discuss it further.

9. The disclosure obligation under Rule 2014(a) is in some ways broader and in other ways narrower than the disclosure obligation under 11 U.S.C. § 329(a) and Rule 2016(b). If applicable, this obligation would require disclosure of any payment on any antecedent debt, not limited to payments on fees for services in contemplation of bankruptcy. On the other hand, the requirement would also be narrower in that it would be limited to payments within the 90 day preference period of 11 U.S.C. § 547(b), and not the one year period of 11 U.S.C. § 329(a) and Rule 2016(b).

2. The debtor was not insolvent at the time of the transfers under 11 U.S.C. § 547(b)(3). (Affidavit of John Bohl, Tanners' certified public accountant, paragraph 15).

3. The transfers were contemporaneous exchanges for new value under 11 U.S.C. § 547(c)(1).

4. The transfers were in the ordinary course of business under 11 U.S.C. § 547(c)(2).

5. The transfers were followed by new value under 11 U.S.C. § 547(c)(4).

Halbert argues that because the transfers were not legally recoverable preferences, he was not required to disclose the transfers in his affidavit of disinterestedness.

■ The Court rejects this argument for several reasons. First, as attorney for the debtor, Halbert owes his full obligation and loyalty first to his client. *Woods v. City Nat'l Bank & Trust Co.,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941); *Micro–Time Management,* 102 B.R. at 605–6; *Brennan,* 187 B.R. at 150; *In re Diamond Mortgage Corp.,* 135 B.R. 78, 90 (Bankr.N.D.Ill.1990). He is thus required by law to set aside his own personal interest in the preference issue, and examine it from the debtor's perspective. From that perspective, a preference claim against him certainly would be viable, as there are both law and facts available to support the position that the debtor would take on each of the issues that Halbert now raises:

1. On the antecedent debt issue, *In re Investment Bankers, Inc.,* 136 B.R. 1008, 1018 (D.Colo.1989), *aff'd,* 4 F.3d 1556 (10th Cir.1993) holds that a debt for legal services arises when the services are performed, not when the subsequent invoice is issued.

2. Halbert's present argument that Tanners was not insolvent during the 90 days before the filing is not only disingenuous but also potentially damaging to the estate.[10] Much more significant than Bohl's present affidavit of solvency is that Halbert has obtained judgments and settlements totalling $134,568 on eight preference adversary proceedings. (Exhibit 7 attached to Halbert's motion for summary judgment, behind tab 8). Obviously, in each of those proceedings, Halbert alleged insolvency. Moreover, he did so after consulting with Bohl. (Halbert's Affidavit, paragraph 56). The potential consequences of Halbert now asserting solvency, supported by an affidavit of Tanners' accountant, can be very damaging to Tanners. This manifests the very conflict of interest that these disclosure rules were designed to avoid. By his defense of his fee applications, Halbert has now economically and legally aligned both himself and Tanners' accountant with the preference defendants against his former client. This is the essence of an "adverse interest." The Court simply cannot permit a member of its bar to demonstrate such client disloyalty and to manipulate its processes so casually.

3–5. Pursuant to 11 U.S.C. § 547(g), Halbert has the burden of proof on each of the affirmative defenses under 11 U.S.C. § 547(c) that he now argues would preclude a preference recovery against him. That consideration alone is sufficient to foreclose further discussion of these issues for present purposes.

**10.** On the issue of solvency, Halbert states in his affidavit, paragraph 11, that he reviewed Tanners' financial statements from May of 1994, which showed a positive net worth of $376,-554.00 and therefore solvency. For present purposes, it is sufficient to note that this financial statement was dated four months before the beginning of the preference period, and thus may not by itself be sufficient to rebut the presumption of insolvency during the preference period under 11 U.S.C. § 547(f). Moreover, those statements state a value for Tanners' assets on a cost basis, not on a "fair valuation" basis, as required by the definition of "insolvency" under 11 U.S.C. § 101(32)(A). Finally, Tanners' bankruptcy schedules disclosed liabilities exceeding assets by over $800,000.

Also, the affidavit (paragraphs 10–12) makes it reasonably clear that the reason that Halbert was concerned about Tanners' solvency related more to his concern about how to respond to a potential issue of whether the Tanners' chapter 11 case would be filed in good faith. Halbert discussed that issue with Bohl and Yousif not only because of the solvency shown in the six month old financial statement, but also because Yousif had stated that Tanners could pay all of its creditors and the only relief that Tanners needed was for two shopping center leases.

However, the Court would note that there are substantial problems with each of the defenses. First, regarding the contemporaneous exchange defense under 11 U.S.C. § 547(c)(1), there is no evidence that the transfers of merchandise were in payment for legal services provided at the times of those transfers.

Second, in order to establish the ordinary course of business defense under 11 U.S.C. § 547(c)(2), Halbert would have to establish: (A) that the debt for his legal services was incurred in the ordinary course of Tanners' business; (B) that the payments (merchandise transfers) were in the ordinary course of business between Tanners and Halbert; and (C) that the payments were made according to ordinary business terms. *In re Fred Hawes Org., Inc.,* 957 F.2d 239 (6th Cir. 1992). There are substantial issues with two of these elements. Under the first element, the issue would be whether the debt incurred for legal services arising from Tanners' financial problems and in contemplation of bankruptcy is a debt incurred in the ordinary course of Tanners' retail coat business. Under the third element, the issue would be whether in the ordinary course of the legal business, clients pay lawyers with merchandise. On this point the Court notes that Halbert's affidavit (paragraphs 5 and 19) states that he would have preferred cash.[11] It appears that Halbert may have difficulty meeting his burden of proof on these elements of the "ordinary course of business" defense under 11 U.S.C. § 547(c)(2).

Finally, Halbert relies most heavily upon the subsequent new value defense under 11 U.S.C. § 547(c)(4). Certainly Halbert would be able to establish this defense if the coats are valued at 40% of the retail sales price. However, the defense would not fully succeed if the coats are valued at the full retail sales price. Because the retail sales value of the coats transferred ($17,665 per exhibit 3 attached to Halbert's motion for summary judgment) exceeds the value of the services subsequently provided by Halbert ($10,923, per exhibit 5 attached to Halbert's motion for summary judgment), that would certainly be an issue under this defense.

■■■ As a matter of law, the Court concludes that debtor's counsel must disclose in the attorney's affidavit of disinterestedness each payment received from the debtor within 90 days before the bankruptcy filing. *In re Decor Corp.,* 171 B.R. 277 (Bankr.S.D.Ohio 1994); *In re American Thrift & Loan Ass'n,* 137 B.R. 381 (Bankr.S.D.Cal.1992); *In re 419 Co.,* 133 B.R. 867 (Bankr.N.D.Ohio 1991).

To permit the debtor's attorney the opportunity to decide whether to disclose such a payment based upon the attorney's own analysis of whether it is a recoverable preference places the attorney in an impermissible conflict between his own self-interest and the interests of the client.[12] *See Decor Corp.,*

---

11. Halbert's affidavit, paragraph 19, states:

In the three years plus that I represented Tanners prepetition, I at all times would have much preferred to receive cash for my services than Tanners merchandise. Initially, I could arguably justify to myself that accepting merchandise instead of cash was not much of a difference because of my family's need or ability to use Tanners coats. However, as substantial fees began to accrue, it became obvious that my immediate family's need for coats was nowhere near our need for cash. Nevertheless, I agreed to continue the merchandise for fees arrangement under the Second Letter Agreement simply because of Yousif's much emphasized preference for doing so, the possibility that Yousif would discontinue using my services if I absolutely insisted on cash payments, our agreement to apply only 40% of the retail sales price of merchandise to fees, and the fact that I could at least use merchandise as gifts for relatives. In fact, more than half of the coats I accepted from Tanners were given as gifts to relatives outside of my immediate family. My

family had a much greater need for cash and my acceptance of merchandise instead was of much greater importance to Yousif and Tanners that [sic] it was to me.

12. In this regard, the Court notes that Halbert's brief misinterprets Rule 2014(a). It states (page 12), "The only disclosure requirements [regarding disinterestedness] are those contained in Bankruptcy Rule 2014, requiring a professional applying for appointment to disclose *'to the best of the applicant's knowledge,* all of the persons' connections with the Debtor. . . . ' " This significantly confuses the "applicant" (the debtor) with the "professional." It also confuses their respective obligations. Under the rule, the debtor is obligated to disclose "to the best of the applicant's knowledge" all of the professional's connections with the debtor. The professional is obligated to file a verified statement of his connections with the debtor.

Arguably, Tanners' disclosures under this rule were as insufficient as Halbert's. This does not

171 B.R. at 282; *Diamond Mortgage,* 135 B.R. at 97. It also deprives the Court of the opportunity to fulfill its obligation to make an independent judgment on any issues of disinterestedness. *Granite Sheet Metal Works, Inc.,* 159 B.R. at 846; *Decor Corp.,* 171 B.R. at 282.

In this case, Halbert violated his obligation to disclose the transfers of merchandise that he received within 90 days of filing.

### IV. *Did Halbert Improperly Take Fees Without Court Approval as Required by 11 U.S.C. § 330?*

As noted in Part II above, Halbert obtained payments of fees from three sources after the petition was filed:

| | |
|---|---|
| From the retainer (pre-confirmation) | $26,600.00 |
| From the debtor directly (post-confirmation) | $45,000.00 |
| From preference recoveries (post-confirmation) | $ 6,868.92 |

The analysis of the first type of payment is different from the analysis of the latter two types.

#### A. *The Payments from the Retainer*

■ In *Downs,* the court of appeals held, "Retainers paid to counsel for the debtor are to be held in trust for the debtor, and the debtor's equitable interest in the trust is property of the estate." 103 F.2d at 478. The court of appeals quoted with approval the decision in *In re Chapel Gate Apts., Ltd.,* 64 B.R. 569, 575 (Bankr.N.D.Tex.1986), "[A]ny attorney who unilaterally withdraws against a retainer while representing a debtor in bankruptcy proceedings is plainly in violation of the strictures of the Code." Accordingly, this Court concludes that when Halbert withdrew the $26,600 retainer, he violated the Bankruptcy Code.

Basically, Halbert's response is that everyone does it. This is a frivolous defense requiring little substantive comment. Halbert supports the claim with an affidavit of one attorney, Arnold Schafer (Exhibit 11 attached to Halbert's motion for summary judgment), which states:

Prior to filing a Chapter 11 Petition, SCHAFER & WEINER, P.C. enters into a fee agreement with its client. The retainer agreement provides that any retainer or fees received are earned upon the receipt. As a matter of operating policy, those retainers, although earned immediately, are deposited in our trust account. We draw from that retainer as it is earned on a weekly, bi-weekly or monthly basis. The fee agreement along with the 2016 affidavit is filed with the Court.

Upon filing the first application for fees, the retainer, if earned, is deducted from any additional request. We operate in this method because it is difficult for a small office to operate without receiving any funds after undertaking a new file.

However, the record establishes that in this case, Halbert did not follow the Schafer firm's regular practice. First, Halbert did not enter into a written fee agreement, as Schafer's firm does. Second, Halbert did not disclose the fee agreement in the Rule 2016(b) statement, as Schafer's firm does. Third, although Schafer's affidavit is not specific on this point, under his practice, the Court is presumably given the opportunity beforehand to review and approve the process for drawing upon the retainer, as required; Halbert did not do that here. Accordingly, Schafer's affidavit simply does not help Halbert on this issue.

Moreover, the order authorizing debtor to employ Halbert, entered on December 29, 1994, and prepared by Halbert himself, specifically states, "Compensation shall be paid after application and Court order authorizing payment." This could not be clearer. Yet six days later, Halbert withdrew $10,000 from the retainer!

On this point, Halbert makes three other arguments. (Halbert's Affidavit, paragraph 74). First, he states that he was unaware of the law on point. Second, he states that at the point of each of the four withdrawals from the retainer, he determined that he had already performed legal services exceeding

---

help Halbert for several reasons. First, Halbert drafted the application for Yousif to sign on behalf of Tanners, and presumably Yousif relied upon Halbert's implicit advice that the application was legally sufficient. Second and more importantly, the issue here is the sufficiency of Halbert's disclosures, not the debtors'.

the amount withdrawn. (Exhibit 10 attached to Halbert's motion for summary judgment). Third, he states that after the Court raised the issue at the first hearing on his fee applications on February 10, 1997, and after he then researched the issue and found this Court's 1991 decision in *In re Doors & More* on point and against his position, he returned the money to his client trust account.

Even if credible, none of these considerations undermines the conclusion that Halbert violated the Bankruptcy Code and a specific court order when he took payments for his fees from the retainer.

### B. *The Payments Directly from the Debtor and From the Preference Recoveries*

■ After the plan was confirmed, Halbert received $45,000 in three payments directly from his client, and $6,868.92 from two preference recoveries. Halbert argues that under Article 11.2 of the confirmed plan, these payments violated neither the Bankruptcy Code nor a court order.

The Court agrees that these payments did not violate the Bankruptcy Code or a court order. However, there is still a problem. Article 11.2 of the confirmed plan provides:

> As of the Confirmation Date, any services performed by any professional on behalf of the Debtor with respect to its case after the Confirmation Date shall not be subject to the prior review and approval of the Court. All such fees shall be billed directly to the Debtor and the Court shall only review that portion of the billed services to which the Debtor objects. The portion not objected to shall be paid in accordance with the terms of the invoice.

■ This provision foresees a process in which Halbert would first submit to the debtors a bill for services performed. The debtors would then have an opportunity to review the bill and object to a portion or all of it. The debtors would then pay the agreed portion, and Halbert would file a motion that would permit the debtors to be heard on, and that would permit the Court to review, the balance to which the debtors object. There is no problem with this process for the payment of fees post-confirmation, where, as

here, it is incorporated into a plan that is confirmed by the Court. This process, like the rest of the plan, is binding on all parties under 11 U.S.C. § 1141(a).

However, the record establishes that Halbert did not follow this process in this case. He did not submit to the debtors any bill for services before receiving any of these payments. Rather, each of the payments resulted from a conversation between Halbert and Sami Yousif. (Halbert's affidavit, paragraphs 48, 51, 52, 58, 59). Halbert did finally submit to the debtors a legal invoice for his post-confirmation work on December 9, 1996. (Exhibit 5 attached to Halbert's motion for summary judgment, behind tab 6). However, this was well after Halbert requested and received the post-confirmation payments.

The Court concludes that Halbert did not properly follow the procedure for payment of his post-confirmation fees as set forth in Article 11.2 of the confirmed plan.

### V. *What Sanctions Should Be Imposed in These Circumstances?*

In light of the Court's findings, as stated above, the Court concludes that the better interests of justice require the Court to give the parties another opportunity to be heard on the issue of the sanctions that should properly be imposed in this matter. The parties should address the following cases (and any others that may be instructive): *In re Downs*, 103 F.3d 472 (6th Cir.1996); *In re Montgomery Drilling Co.*, 121 B.R. 32 (Bankr.E.D.Cal.1990); *In re Kendavis Indus. Int'l, Inc.*, 91 B.R. 742 (Bankr.N.D.Tex. 1988); *In re Diamond Mortgage Corp.*, 135 B.R. 78 (Bankr.N.D.Ill.1990); *In re Federated Dep't Stores, Inc.*, 44 F.3d 1310 (6th Cir. 1995); *In re Middleton Arms Ltd. Partnership*, 934 F.2d 723 (6th Cir.1991); *In re Eagle–Picher Indus., Inc.*, 999 F.2d 969 (6th Cir.1993); *Woods v. City Nat'l Bank & Trust Co.*, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941). An order establishing a briefing schedule will be entered. No further oral argument will be scheduled.